JOURNAL ENTRY and OPINION
In these consolidated cases, defendant-appellant Marcus Blalock appeals from his convictions for murder, aggravated murder, kidnaping, aggravated robbery, having a weapon while under disability, tampering with evidence and obstruction of justice. He raises fourteen assignments of error, as set forth in the attached appendix. We find no error relevant to appellant's convictions in Case No. CR-407194 for murder, aggravated murder, kidnaping, aggravated robbery and having a weapon while under disability. Therefore, we affirm that judgment. However, we find there was insufficient evidence that appellant obstructed justice, so we reverse appellant's conviction for that offense. We also find the court erred by making the sentence in Case No. 407947 consecutive to the sentence in Case No. 407194. Therefore, we reverse the sentence for tampering with evidence in Case No. 407947 and remand for resentencing for that offense.
 Facts and Proceedings Below
In Case No. CR-407194, appellant was indicted for three counts of aggravated murder with felony murder and firearms specifications, kidnaping with a firearms specification, aggravated robbery with a firearms specification, and having a weapon while under disability. He was also indicted for tampering with evidence and obstructing justice in Case No. CR-407947. The two cases were consolidated on the state's motion. The felony murder specifications were deleted from the aggravated murder charges, also on the state's motion. The first aggravated murder charge was amended to charge murder. Appellant waived a jury trial as to the weapons charge. The jury trial on the remaining charges commenced on August 13, 2001.
During the state's case at trial, the jury heard the testimony of co-defendant Arketa Willis, at whose house the murder occurred; forensic pathologist Eric Vey; the victim's sister, Kimberly Rose; his friends Lenor Lamar and Tawain Gordon; police dispatcher Vikki Milano; Dorothy and James Evans, who were the aunt and uncle of co-defendant Arketa Willis and lived next door to her; the Maple Heights police officers who responded to the scene on the night of the murder and investigated thereafter; Steven Wiechman, a forensic scientist who conducted DNA testing; Pennsylvania state troopers Marc Stevick and Jay McKee; Michael Walker, the owner of the Big Family Lounge, where Arketa Willis worked; Rita Hargrove, one of Willis's coworkers and friends; record keepers for Verizon Wireless and Sprint; and John Saraya, special agent for the Bureau of Criminal Investigation, who photographed the scene where the murder occurred. These witnesses disclosed the following facts:
 At approximately 8:00 a.m. on Saturday March 24, 2001, the badly burned body of Howard Rose was found in the back of a pickup truck which had itself been badly damaged by fire on the eastbound side of Interstate 90 just west of Exit 6 in Pennsylvania. Tire tracks indicated that another vehicle had been stopped behind the truck and proceeded east on Interstate 90. Some fabric, parts of a watch and a thin necklace and a cross were recovered from the bed of the truck. Forensic examination revealed that the cause of death was a single gunshot wound to the back of the head at point blank range.
The truck was registered to a Lenor Lemar. Through this connection, the Pennsylvania State Police located and interviewed family and friends of the victim, Howard Rose.
During the course of the investigation, the state police discovered that the Maple Heights Police had responded to an incident on the night of March 23 at the home of Arketa Willis. Willis's aunt and neighbor, Dorothy Evans, called police at approximately 11:20 p.m. to report suspicious activity at Willis's house, where there were two men parked in the driveway. Police responded. The car left the scene. Police pursued it and apprehended the two men inside Dion Johnson and Ernest McCauley. McCauley had blood on his clothes. They were both arrested.
Police entered the house and found coagulated blood and a pager with blood on it. Blood was also observed on the driveway. The blood on the pager was later tested and found to be Rose's.
Willis was interviewed by the police on April 6. At first, she told them that the blood on the driveway was from a dog fight, but she later abandoned that story and told the police that she saw the victim dead on her bed. She also told them she was afraid of appellant and he was the one who killed Rose. Police searched her home and found that the bedroom was freshly painted and had a new mattress and box spring; the driveway had been washed with bleach.
Willis was interviewed again on April 9 and told police that appellant took her car and took the body to Pennsylvania. She retracted this statement later, and admitted that she was with appellant when they took the body to Pennsylvania.
Willis testified that she met Rose at Rose's grandfather's house on March 23. When she got there, she received a call from appellant asking her if she knew anyone who had drugs. Willis turned the call over to Rose, who she knew to sell drugs.
Rose and Willis drove to Lorain. They made several stops, then went to a restaurant for dinner. She saw that Rose had a substantial amount of cash.
Rose took Willis home, where she bathed and dressed for work. Rose told Willis that he had told appellant to meet him at Willis' house that night. Appellant came to the house before Willis left. Willis then went to work driving Rose's truck.
Willis expected Rose to come to get his truck at the Big Family Lounge where she worked. When Rose didn't come, Willis tried to call appellant from work but got no answer. After calling four or five times at various numbers, appellant finally answered. Willis asked where Rose was. Appellant told her that he was busy and she should call back. Approximately thirty minutes later, she called appellant again, and he told her he would call her back. Appellant called less than half an hour later, telling Willis to come home and bring the truck.
When Willis went home, she found a car parked in front of her house with two people inside. One was Ernest McCauley, whom she knew. All three of them entered the house together. She saw Rose's body lying on her bed in blood. Appellant told her that he had to do Rose.
Appellant and McCauley carried the body in blankets through the kitchen and out the side door to the truck. With the help of the third person, Dion Johnson, they got the body into the truck. Ms. Willis drove the truck away as the police arrived. She went to a gas station, where she called the Big Family and had a friend, Omar, come to pick her up and take her back to work. She left the truck parked on a side street.
When Willis got off work, she went home, wiped blood off a doorway and poured water on the blood on the driveway. She and Omar then went to the police station. The police told her to go home, where she was met by police officers. They asked her about the blood in the driveway, and she told them there was a dog fight.
Willis and Omar then went to appellant's house. Willis had seen appellant and his girlfriend, Angie, on her way home from work. Appellant put a gas can in the trunk of Willis's car and they drove to the truck. Appellant drove the truck and she and Omar followed.
They traveled east on Interstate 90. At a rest stop, appellant removed the gas can from Willis's car and took it with him in the truck. Near daylight, appellant pulled the truck to the side of the road. Willis pulled in behind him. The truck burst into flames and appellant jumped out. He got in Willis's car and they continued to drive east to New York City, where they stayed not more than four hours. They drove back that evening but got lost, finally arriving in Cleveland around 8:00 a.m. on Sunday.
At the conclusion of the trial, the jury found appellant guilty of all charges. The court found him guilty of possession of a weapon while under disability.
In Case No. 407194, the court sentenced appellant to a term of fifteen years to life imprisonment on the murder charge; life imprisonment with eligibility for parole in twenty years on each of the aggravated murder charges; ten years' imprisonment on each of the aggravated robbery and kidnaping charges; and twelve months imprisonment on the weapons charge. All of these sentences were to be served concurrently with one another and consecutive to the mandatory three year sentence on the firearms specifications in each of the first five charges, which were merged for purposes of sentencing.
In Case No. 407947, the court sentenced appellant to concurrent terms of five years on the tampering with evidence and obstructing justice charges. This sentence was to be served consecutive to the sentence in Case No. 407194.
 Law and Analysis Assignment of Error I
Appellant first argues that the court erred by denying his request to review the grand jury transcript. He contends that the grand jury process was abused because Detective Joseph Hribar, the investigating police officer, had testified at a preliminary hearing that he did not know who killed Rose. Apparently, appellant asks us to infer that Hribar still did not know who killed Rose when Hribar testified before the grand jury, and therefore there was no probable cause to indict appellant.
[A]n accused is not entitled to see grand jury transcripts unless the ends of justice require it and he shows that `a particularized need for disclosure exists which outweighs the need for secrecy.' State v. Benge (1996), 75 Ohio St.3d 136, 145 (quoting State v. Greer (1981),66 Ohio St.2d 139). When the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial, grand jury proceedings may be disclosed. State v. Sellards (1985), 17 Ohio St.3d 169, 173.
Appellant's speculation about the content of Detective Hribar's grand jury testimony challenges the basis for the grand jury's finding of probable cause. However, [t]he grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence. United States v. Calandra (1974), 414 U.S. 338, 344-45. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. Villasino v. Maxwell (1963), 174 Ohio St. 483,485. Consequently, a challenge to the grand jury's finding of probable cause does not demonstrate a particularized need for disclosure of the testimony. The first assignment of error is overruled. State v. Brown (1988), 38 Ohio St.3d 305, 308; State v. Davis (1988), 38 Ohio St.3d 361.
 Assignment of Error II
Appellant next argues that the court erred by allowing the state to bolster the testimony of Arketa Willis after she was impeached on cross-examination. Willis testified that she provided three statements to the police, two before she was indicted, on April 6 and 9, 2001, and one after she was indicted, in June or July 2001. On cross examination, she admitted that basically everything [she] told the police on April the 6th was a lie. On redirect, the prosecutor instructed Willis to read the April 6 statement aloud and identify which portions were true and which were not.
Appellant claims the April 6 statement was a prior consistent statement which was inadmissible as hearsay except to rebut an express or implied charge * * * of recent fabrication or improper influence or motive. Evid.R. 801(D)(1)(b). He claims the April 6 statement which was used on cross-examination could not also be introduced for purposes of rebuttal because they were contemporaneous; the consistent statement did not precede the inconsistent one.
When a portion of a prior written statement is used to impeach a witness by showing an inconsistency with the current testimony, the entire document may be admitted on rebuttal, to rehabilitate the witness. Shellock v. Klempay Bros. (1958), 167 Ohio St. 279, 282; State v. Johnson (Nov. 12, 1998), Cuyahoga App. No. 57790; State v. Rivera (Nov. 9, 1989), Cuyahoga App. No. 56158. Willis testified that parts of her April 6 statement were true, and identified those parts. This testimony rebutted the implication that her current testimony was entirely fabricated. Therefore, we overrule the second assigned error.
 Assignment of Error III
Appellant urges that he was denied his right to confront the witnesses against him because the court would not allow him to cross-examine a police officer about the potential penalties Willis faced before she entered into her plea agreement. Officer Hribar testified that when Willis spoke to the police after her indictment in May, she was facing a charge of capital murder which involved a potential death sentence. The jury was also informed that the capital specification was removed from the indictment as to all of the defendants, including Willis, before Willis entered her guilty plea. Thus, at the time she entered into her plea, all defendants, including Willis, faced a life sentence. Willis testified that her plea agreement called for the dismissal of the murder, aggravated murder, kidnaping, and aggravated robbery charges in exchange for her testimony, but the court refused to allow defense counsel to inquire about the specific penalties that Willis faced after her plea, limited the jury to considering that Willis faced a reduced sentence.
The trial court has broad discretion in determining the scope of cross examination. The jury heard evidence that Willis faced reduced charges and a reduced sentence as a result of her plea and agreement to testify. Appellant was not prejudiced by the court's refusal to allow him to inquire about the specific penalties that Willis faced after her plea.
 Assignment of Error IV
Appellant argues the court erred by excluding an out-of-court statement by co-defendant Ernest McCauley that Willis admitted to him that she killed Rose. McCauley did not testify in this case. Willis did. An out of court statement by one person (McCauley) about an out-of-court statement by another person (Willis) is double hearsay.
We are aware of no exception to the hearsay rule which would allow the admission of McCauley's out of court statement to the police. The statement would clearly have been offered in evidence to prove the truth of the matter asserted, that is, that Willis killed Rose. McCauley's statement to police implicating Willis clearly does not further a conspiracy and therefore cannot be considered a non-hearsay co-conspirator's statement. Evid.R. 801(D)(2); State v. Carter (1995),72 Ohio St.3d 545, paragraph four of the syllabus. Even though McCauley did not testify at trial and was probably unavailable within the meaning of Evid.R. 804(A)(1) because he remained subject to prosecution, his statement did not meet any of the exceptions of Evid.R. 804(B).
Even if McCauley's statement to the police were admissible, Willis's statement to McCauley was not. Again, the statement would have been offered in evidence to prove the truth of the matter asserted, that Willis killed Rose. See Evid.R. 801(C). This statement by Willis was not made under oath subject to cross examination. Evid.R. 801(D)(1). None of the exceptions set forth in Evid.R. 803 applies. Because she testified at trial, Evid.R. 804 is inapplicable.
Therefore, the court did not err by excluding McCauley's out-of-court statement that Willis admitted she killed Rose.
 Assignment of Error V
Appellant next asserts that he was denied a fair trial because of improper prosecutorial argument. First, he claims the prosecutor improperly commented on his failure to call a witness. In closing argument, the prosecutor said:
 Ladies and gentlemen, we know that 299-2364 and 299-9459, we know one thing. We know those phones are listed to Marcus Blalock. These are cell phones, ladies and gentlemen, and at any point in time you can give it to someone else and they could be using the phone. Bernard Blalock said that. I asked Bernard Blalock, who's Angie? Angie is his girlfriend. Do you know if Angie gets to use his phone? Yes.
 Angie, the woman who Arketa Willis said she saw around 11:00 that night driving around with him. Where is Angie?
MR. DOYLE: Objection.
THE COURT: Overruled. It's argument.
Appellant has failed to demonstrate that this statement constitutes a comment on his failure to call a witness. In light of the preceding argument, the question, Where's Angie? is more properly construed as a suggestion that Angie made and received calls using one of the cellular telephones. In any event, that single question was so ambiguous and so limited that we cannot say appellant was prejudiced by it.
Appellant also argues the prosecutor improperly expressed his personal opinion of appellant's guilt. Near the end of his closing argument, the prosecutor said:
 You had the benefit of hearing this woman [Willis] for over a day in court. Mr. Bradley [defense counsel] wants to label her a liar. It's not for Mr. Bradley to determine. It's your job. You heard her. She was cross-examined and you make your determination whether what this woman said is unbelievable. We can only bring you the people who were there, ladies and gentlemen. And she was there and she has knowledge but she is not the killer.
* * *
 Ladies and gentlemen, the evidence in this case has clearly shown that sitting in this courtroom at this moment is a cold-blooded ruthless murderer and he sits right there and his name is Marcus Blalock. * * * This is not the work nor is this bullet in the back of the head the work of Arketa Willis. This is the work of Marcus Blalock. And I ask you to so reflect in the verdict that you return in this case. Thank you.
The prosecutor's argument that the jury should find that appellant killed Rose is not improper. The prosecutor did not express his personal opinion by arguing that appellant was the killer. Therefore, we overrule the fifth assignment of error.
 Assignment of Error VI
Sixth, appellant urges that the court should have inquired about the reason why one of the jurors was distressed and failed to respond when the court polled the jurors individually. As the court read the verdicts, appellant interjected with comments, including This is bullshit, This ain't right, This is crazy, and When are we appealing this? The court polled the jury as a group and, on defendant's request, polled each juror individually. When the court reached juror number 3, the juror responded as follows:
THE COURT: Juror No. 3, are these your verdicts?
JUROR NO. 3: I'm sorry.
THE COURT: Juror No. 3?
JUROR NO. 3: (No response.)
THE COURT: Would you like me to come back to you?
JUROR NO. 3: Yes.
After the court finished polling the remaining jurors, the court asked:
THE COURT: Again, Juror No. 3?
JUROR NO. 3: (No response.)
 THE COURT: No. 3, you have signed your name to the verdict forms, have you not?
JUROR NO. 3: Yes.
 THE COURT: I know it's difficult. Juror No. 3, are these your verdicts?
JUROR NO. 3: Yes.
Appellant did not ask the court to inquire about the basis for the juror's failure to respond. Consequently, we must consider whether it was plain error. There were a number of reasons why the juror may have been reluctant or unable to respond to the court's question, including, for example, appellant's angry response to the verdicts. However, the juror gave no indication that she was ambivalent about her verdict when she finally did respond to the court. She did not try to explain her answer. There is no hint of misconduct by any of the jurors. Therefore, the court did not plainly err when it accepted the juror's statement that these were her verdicts without further inquiry.
 Assignment of Error VII
In his seventh assignment of error, appellant claims that the court erred by failing to give the jury an instruction on alibi. Appellant did not request an alibi instruction at trial, so we must review the court's failure to give an instruction for plain error.
The evidence here did not support an alibi charge. William Aden testified that he had hosted a party for alumni of the University of Cincinnati on Friday, March 23 and Saturday, March 24, 2001. He could not say for sure whether he saw appellant at the event on Friday, March 23. He did see appellant at the event on Saturday evening, recalling that appellant arrived between 6:00 and 7:00 p.m. and left a couple of hours later, perhaps as late as 10:00 or 10:30 p.m.
The crimes occurred on March 23 and the early morning of March 24; the witness did not know the appellant's whereabouts at those times. Therefore, the evidence did not support an alibi instruction. Accordingly, the court did not err by failing to give an alibi instruction.
 Assignment of Error VIII
In his eighth assignment of error, appellant contends that the court erred by failing to instruct the jury that if it found that Willis testified falsely about a material fact, it could disregard her testimony entirely. Appellant did not request such an instruction so, again, we must consider this alleged error under a plain error standard.
The court instructed the jury to consider the credibility of the witnesses by applying the tests of truthfulness which you apply in your daily lives. It listed a number of examples of these tests. The court further instructed the jury that it could believe or disbelieve all or any part of the testimony of any witness, and that it is within your province to determine what is worthy of belief and what testimony is not. Finally, the court instructed the jury that if it found Willis was an accomplice to the crimes, it should view her testimony with grave suspicion and weigh it with great caution, because her complicity may affect her credibility and she may have self motives in testifying. These broad instructions were sufficient to guide the jury's evaluation of the witnesses' credibility. The court did not err by failing to instruct the jury specifically that it could disregard the testimony of a witness who lied under oath.
 Assignment of Error IX
The ninth assignment of error contends that the court erred by instructing the jury that it could presume intent to kill from the use of a deadly weapon in a manner calculated to cause death. Once again, appellant did not object to this instruction, so we review it for plain error.
First, appellant argues the instruction created a mandatory presumption. The instruction did not create a mandatory presumption. The court told the jury that if a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon. The term may indicates this was a permissive presumption, not a mandatory one. State v. Loza (1994), 71 Ohio St.3d 61, 81.
Second, appellant asserts that this presumption is invalid because it is not set forth in the Ohio Revised Code. While the Ohio Revised Code defines the elements of a crime, it does not necessarily define how those elements are proved. The fact that this presumption is not set forth in the Revised Code does not make it invalid. See State v. Lockett (1976),49 Ohio St.2d 48, paragraph three of the syllabus.
 Assignment of Error X
Appellant claims the court erred by overruling his motions for judgment of acquittal. When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis (1997), 79 Ohio St.3d 421, 430; State v. Jenks (1991), 61 Ohio St.3d 259. Sufficiency is a test of adequacy; that is, whether the evidence is legally sufficient to sustain the verdict as a matter of law. State v. Thompkins(1997), 78 Ohio St.3d 380, 386. We examine the evidence supporting appellant's conviction on each charge:
 Kidnaping. Willis's telephone calls to appellant indicated he was busy with Rose for at least an hour after she called. Rose died from a gunshot wound to the head, inflicted at point-blank range. Viewed in the light most favorable to the state, the jury could infer from this that appellant restrained Rose for the purpose of inflicting serious physical harm on him. R.C. 2905.01(A)(3).
 Aggravated Robbery. Rose's sister, Kimberly Rose, testified that Rose was carrying approximately $1000 cash and approximately $3000 in cocaine on the day of his murder. Willis also testified that Rose had a large amount of cash. His body was found burned beyond recognition; no wallet was found. The jury could infer from this testimony that appellant or one of his accomplices took the money from Rose either before or after his death. State v. Twyford (2002), 94 Ohio St.3d 340, 354 (robbery charge is not invalid because victim was dead at the time the property was taken).
 Murder/Aggravated Murder. Appellant argues that the only witness to connect him to the death of Howard Rose was Arketa Willis and her testimony was incredible. The credibility of witnesses was a matter for the jury to decide. While other aspects of her testimony changed, Willis consistently said that appellant told her he shot Rose. The forensic evidence disclosed that Rose was shot at point blank range. Therefore, there was sufficient evidence for the jury to conclude that appellant purposely caused Rose's death.
Appellant challenges the aggravated murder convictions on the ground that there was no evidence of kidnaping or aggravated robbery. As pointed out above, we find sufficient evidence to support these charges.
Tampering with Evidence. Appellant urges that there is no support for the charge of tampering with evidence because the only item which was altered, destroyed, concealed or removed was the victim's body, and a body is not a thing which can be altered, destroyed, concealed or removed within the meaning of the statute. We disagree. State v. Canaday (April 16, 1992), Cuyahoga App. No. 60355, at 38.
Obstructing Justice. We agree with appellant that there was insufficient evidence to support the charge of obstructing justice. R.C.2921.32 consolidates and extends similar provisions in former Ohio statute law, so that the new section is roughly equivalent to the common law crime of being an accessory after the fact. 1974 Committee Comment to H.B. 511. In order to prove obstruction of justice, the state must prove an underlying crime committed by another. State v. Logan (1991),77 Ohio App.3d 333, 336. In this case, however, there was no evidence of a crime committed by another; appellant was the principal offender in all of the underlying crimes. Therefore, appellant could not have been guilty of destroying or concealing evidence or communicating false information for the purpose of hindering the discovery, apprehension, prosecution, conviction or punishment of another offender, and the obstruction of justice charge should have been dismissed.
 Assignment of Error XI
Appellant contends that the indictment was duplicitous and multiplicitous because (1) two or more crimes were charged in a single count, and (2) the charges were interdependent, and (3) the same crime was charged in multiple counts. Defects in the indictment (except for lack of jurisdiction and failure to charge an offense) must be raised before trial. Crim.R. 12(C)(2). Therefore, appellant waived this issue by failing to raise it before trial.
In any case, an indictment may allege conjunctively the offense to have been committed in more than one way. State v. Hollis (May 15, 1997), Cuyahoga App. No. 70781, at 12. The state may also indict a defendant on multiple charges based on different theories of the same criminal act. The court may submit multiple offenses of similar import to the jury, although the defendant can only be convicted of one offense. See R.C.2941.25(A); State v. Brown (1988), 38 Ohio St.3d 305, 317; State v. Osborne (1976), 49 Ohio St.2d 135, 144. Therefore, dismissal of these charges would not have been appropriate, though they may have been merged for sentencing. Accordingly, we overrule the eleventh assignment of error.
 Assignment of Error XII
The twelfth assignment of error raises a related issue. Appellant claims the court erred by sentencing him to multiple punishments for allied offenses. The state concedes that while multiple counts of murder were properly submitted to the jury, the appellant could only be convicted and sentenced for one offense. However, the state urges that appellant was not prejudiced by this error because he received concurrent sentences. We agree. State v. Patrick (Aug. 27, 2001), Cuyahoga App. No. 77644. Because appellant was not prejudiced by any error in the court's failure to merge allied offenses, we overrule the twelfth assignment of error.
 Assignment of Error XIII
Appellant contends the court erred by making the sentences imposed in Case No. 407947 consecutive to the sentences imposed in Case No. 407194. The state agrees the trial court failed to make the requisite findings necessary to impose consecutive sentences. Given our reversal of appellant's conviction for obstructing justice, however, we need only reverse the sentence imposed for tampering with evidence in case no. 407947 and remand for resentencing on that charge. See, e.g., State v. Long (Aug. 9, 2001), Cuyahoga App. No. 78616.
 Assignment of Error No. XIV
Finally, appellant claims the common pleas court erred by sentencing him to five years imprisonment for obstruction of justice, thus considering the offense a third degree felony rather than a misdemeanor. We have found the evidence was insufficient to support the charge of obstruction of justice. Therefore, this assignment of error is moot.
We affirm the judgment in Case No. 407194. We reverse appellant's conviction and sentence for obstructing justice in Case No. 407947. We further reverse the sentence imposed for tampering with evidence in Case No. 407947 and remand for resentencing.
This cause is affirmed in part, reversed in part and remanded to the lower court for further proceedings consistent with this opinion.
It is, therefore, considered that said appellants recover of said appellee their costs herein.
It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANNE L. KILBANE, J. and JAMES J. SWEENEY, J. CONCUR.
 APPENDIX STATEMENT OF ASSIGNMENTS OF ERROR PRESENTED FOR REVIEW
1. Defendant was denied due process of law when the court did not disclose the transcript of the Grand Jury [sic] to defense counsel. (Tr. 41, 58, 70-71, 92-93, 107, 1462-63)
2. Defendant was denied due process of law when the court permitted the prosecutor to bolster the testimony of Arketa Willis after she had been cross-examined and admitted to making a number of inconsistent statements. (Tr. 1284, 1286, 1290, 1291, 1297, 1311)
3. Defendant was denied his constitutional right of confrontation and cross-examination. (Tr. 384, 389-90, 1263, 1453)
4. Defendant was denied his constitutional right to present a defense when the court would not allow evidence concerning Arketa Willis' admission to shooting Howard Rose. (Tr. 824, 1029, 1030-31)
5. Defendant was denied a fair trial by reason of improper prosecutorial argument. (Tr. 1867, 1881)
6. Defendant was denied due process of law and a fair trial and impartial jury when the court did not take proper action in determining the cause of distress by a juror when the verdicts were announced in open court. (Tr. 1296 [sic], 1927, 1928, 1930)
7. Defendant was denied due process of law when the court did not give any instruction concerning alibi. (Tr. 1658-62)
8. Defendant was denied due process of law when the court did not give any instruction concerning the willful lies by Arketa Willis. (Tr. 1885)
9. Defendant was denied due process of law when the court gave no instruction resulting in an impermissible and unconstitutional presumption [sic].
10. Defendant was denied due process of law when the court overruled motions for judgments of acquittal. [Citations to transcript omitted.]
11. Defendant was denied due process of law when he was charged under a duplicitous and multiplicitous indictment and there was no requirement of jury unanimity. (Tr. 1890, 1892, 1893, 1895, 1896, 1897, 1898, 1899, 1906, 1907)
12. Defendant was subjected to multiple punishments when defendant was sentenced on all counts of the indictment.
13. Defendant was denied due process of law when consecutive sentences were imposed. (Tr. 1951, 1952)
14. Defendant was denied due process of law when he was sentenced to a felony sentence for obstruction of justice. (Tr. 1907, 1951)